UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KENNETH MEADOR, as the Personal Representative of the Estate of PAULA MEADOR, and THOMAS MEADOR<br><br>Plaintiffs<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Defendant. | C.A. No.: |

**COMPLAINT**

1. This action arises from the tragic death of PAULA MEADOR ("Paula"), a beloved wife and mother who passed away in June 2019 at the untimely age of 62. Paula was under the care of Dr. KIM HOUDE ("Dr. Houde") who prescribed lithium carbonate to Paula to treat Paula's bipolar disorder. Lithium has a narrow therapeutic range and patients for whom it is prescribed must have their blood levels monitored on a regular basis. For more than three years, while acting as Paula's primary care physician, Dr. Houde failed to monitor Paula's lithium levels.

2. On March 16, 2019, Paula's husband found her slumped over and unconscious. Rushed to the hospital, Paula was diagnosed with acute lithium toxicity, due to the elevated levels of lithium in her blood. Paula never recovered and died on June 15, 2019.

3. Dr. Houde was an employee of the United States within the meaning of 42 U.S.C. § 233 (g). Consequently, the United States is liable for Paula's wrongful death and

all other cognizable damage caused by Dr. Houde's negligence pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, ("FTCA").

## PARTIES, JURISDICTION & VENUE

4. Plaintiff, Kenneth Meador ("Kenneth") is Paula's only son and is the Personal Representative of the Estate of Paula Meador, pursuant to an April 1, 2021 appointment by the Massachusetts Probate Court of Worcester County. A copy of his appointment is attached as Exhibit 1. Kenneth is domiciled in Rockville, Maryland.

5. Plaintiff Thomas Meador ("Thomas") was Paula's husband. He is domiciled in Gardner, Worcester County, Massachusetts, where he lived with Paula until her final illness and ultimate death. Thomas was Administrator of Paula's Estate from October 31, 2019 through April 1, 2021, when Kenneth was appointed as the Personal Representative of Paula's estate.

6. Kim Houde was at all relevant times an employee of Greater Gardner Community Health Center ("GGCHC") which is located at 175 Connors St, Gardner, Worcester County, Massachusetts. GGCHC is an FTCA-deemed facility within the meaning of 42 U.S.C. § 233 (g).

7. Pursuant to the FTCA, Defendant United States is liable for money damages caused by any negligent or wrongful acts or omissions taken by Dr. Houde within the scope of her employment.

8. Plaintiffs have complied with all requirements to bring an action under the FTCA. On March 12, 2021, counsel for the Plaintiffs presented the claims brought in this complaint to the Department of Health and Human Services ("HHS"), submitting Standard Form 95 with attachments. HHS acknowledged that the claim was presented

within two years of Paula's hospitalization for acute lithium poisoning.

9.       On December 22, 2021, HHS denied the Plaintiffs' claims and acknowledged Plaintiffs' right of judicial review pursuant to 28 U.S.C. § 2401(b).  See Exhibit 2.  Plaintiffs have filed this action under the FTCA within six months of the denial of their claims.

10.      Because all acts and omissions resulting in the injury to Paula occurred in the Commonwealth of Massachusetts, Massachusetts law will control this action. 28 U.S.C. § 1346.

11.      This court has jurisdiction pursuant to 28 U.S.C. § 1346 (b), which grants the District Courts exclusive jurisdiction over claims against the United States for money damages for injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. Venue is proper under 28 U.S.C. §1402, because all acts and omissions resulting in the injury to, and death of, Paula occurred in this district.

## FACTUAL ALLEGATIONS

**A.    As the Prescriber of Lithium Carbonate, Paula's Primary Care Physician, Dr. Houde, Had A Duty To Monitor Paula's Blood Lithium Levels**

12.      Paula was a patient at GGCHC since at least 2012, where her primary care physician was Kim Houde.  GGCHC is managed and operated by Community Health Connections which is a Federally Qualified Health Center (FQHC) in Central Massachusetts.  Dr. Houde is employed by Community Health Connections and worked

at its Fitchburg center and GGCHC.  Dr. Houde is a medical doctor licensed to practice in the Commonwealth of Massachusetts.  As an employee of an FQHC, Dr. Houde is deemed to be an employee of the Government for the purposed of the FTCA.

13.     When Paula became a patient of Dr. Houde's she had previously been treated for throat and neck cancer.  In 2008 Paula had a tonsillectomy and a left radical neck dissection.  After several years of follow-up, she was found to be cancer-free by her oncologists and never suffered any relapse of the cancer.

14.     However, as a result of the cancer surgery and follow-up radiation therapy Paula had occasional difficulty swallowing and her trachea had deviated to the left.  She managed these concerns without difficulty for more than 10 years by maintaining a diet of soft foods and other foods that she knew she could handle.  These dietary preferences did not impede her everyday activities or affect her health.

15.     Dr. Houde was aware of Paula's history of neck cancer and treated her for occasional issues that arose as a result of the prior surgical intervention.  She was aware of the changes to Paula's neck and throat as a result of the surgery and the effect of the surgery on Paula's ability to swallow.  Although Paula's impaired ability to swallow did not affect her ability to eat or obtain nutrition, Dr. Houde knew or should have known that any condition that affected her airway or esophagus, including any condition that required intubation, could have serious consequences regarding Paula's abilities to swallow.

16.     When Paula became her patient, Dr. Houde also learned that Paula suffered from bipolar disorder, for which she was being treated with lithium.  Although a psychiatrist at North Central Human Services ("NCHS") in Gardner, MA was initially

responsible for treating Paula's bipolar condition, Dr. Houde was kept abreast of the medications for bipolar Paula was receiving. For example, in June 2015, Paula informed Dr. Houde that Paula's psychiatrist at NCHS had reduced Paula's lithium dose due to side-effects that Paula had reported.

17. In March 2016, Paula notified Dr. Houde that NCHS had been transferred to a new owner, and that the clinic would no longer provide psychiatric services. Paula was not assigned to a new psychiatrist and Dr. Houde, Paula's primary care physician, did not refer Paula to one. Instead, Dr. Houde took responsibility for Paula's lithium carbonate prescription. On March 2, 2016, Dr. Houde prescribed lithium carbonate for Paula at a dose of 450 mg to be taken twice a day.

18. Lithium carbonate is generally a safe and effective treatment for bipolar condition provided that a patient's blood levels remain in the range of 0.6-1.2 milliequivalents per liter ("mEq/L"). Lithium, however, has a narrow therapeutic range. The difference between a dose that is effective (0.6 mEq/L) and a dose that can be toxic (more than 1.2 mEq/L), is smaller than for many other medications. Blood levels of lithium above 1.2 mEq/L can cause toxic side effects, which can include serious renal, thyroid, and neurological injuries, or even death.

19. Even on a stable dose, the blood lithium levels of a patient being treated with lithium carbonate may go up or down significantly. Factors that might cause a patient's lithium level to vary include aging; weight change; commencement or termination of medications that might interact with lithium; changes in metabolism or physiological changes caused by a minor or major illness.

20. Given lithium's narrow therapeutic range and the many factors that can affect its concentration in the blood, it is the well-established standard of care for lithium prescribers to order a check of their lithium patients' blood levels at least every 6 months, with more frequent monitoring if a patient's clinical status changes.  Such testing ensures that the patient's blood levels remain in the safe and therapeutic range. This standard of care applies to psychiatrists as well as primary care physicians who prescribe lithium.

21. The FDA-approved labeling for lithium carbonate warns that lithium toxicity can occur at doses close to therapeutic levels, i.e. at or above 1.2 mEq/L. The FDA-approved labeling for lithium carbonate also recommends that "lithium levels in uncomplicated cases receiving maintenance therapy during remission should be monitored at least every two months."

22. The first time Dr. Houde prescribed lithium carbonate for Paula, on March 2, 2016, she also had Paula's blood lithium level tested.  Paula's blood level on that date was 1.2 mEq/L, which Dr. Houde noted to be the "upper limit of normal."

23. March 2, 2016 was the last time Paula's blood lithium level was tested.

**B.     From March 2016 Until March 2019, Dr. Houde Failed To Monitor Paula's Blood Lithium Levels, Breaching the Applicable Standard of Care.**

24. Until March 16, 2019, Paula led a fulfilling and independent life, living at home with her husband Thomas, going to church, visiting family, listening to gospel songs, and eating out at restaurants in their budget.  Most of the time, however, was spent with Thomas, who had retired in 2016.  Their lives revolved around each other.

6

25. Until March 16, 2019, Paula regularly kept up with her medical check-ups and appointments. She was seen by her primary care physician, Dr. Houde, at least every six months.

26. Between March 28, 2016 and March 16, 2019, Dr. Houde treated Paula on nine occasions at her office. Throughout this period, she wrote prescriptions for Paula for lithium carbonate and knew Paula was not seeing any other medical professional for treatment of her bipolar condition. Nonetheless, while Dr. Houde ordered tests to check Paula's cholesterol, thyroid, and other systems, Dr. Houde did not order any lithium blood level testing or monitoring.

27. By 2018, Paula was presenting symptoms of neurological impairment, a signal that she was suffering from excessive lithium levels. Paula reported memory loss to Dr. Houde at office visits in March 2018, August 2018, and February 2019. During the final office visit, on February 27, 2019 , Dr. Houde asked Paula to draw a clockface, and noted that the clock Paula drew was abnormal.

28. At the February 27, 2019 office visit, Paula also complained of suffering from weight loss. At that visit, Dr. Houde was aware that Paula had lost 18 pounds in the last six months and 31 pounds within the preceding year.

29. This is a significant weight loss that almost certainly affected the concentration of lithium in Paula's blood. Like many drugs, there is a weight/dosage relationship with lithium; larger individuals ordinarily require a larger dosage for effective treatment. Conversely, however, when a patient loses significant weight, what had previously been a maintenance dose becomes too high for the patient's smaller size. A lithium dosage that was acceptable when Paula was heavier could become toxic when

her weight was lowered. Even had Paula's lithium levels been monitored on a regular basis—which they were not—her significant weight loss on February 27, 2019, along with other symptoms of neurological impairment she exhibited on that date, required a competent primary care physician who was prescribing lithium to a patient to order the patient's blood levels to be checked. Dr. Houde did not order such testing.

30. Had such testing been ordered, it would have shown that Paula's lithium levels were at an unsafe level. A competent primary care physician would have curtailed or reduced Paula's lithium prescription, and Paula would not have suffered the acute lithium poisoning that resulted in hospitalizations and ultimately led to her demise.

31. From March 2, 2016 until March 16, 2019, Dr. Houde breached her duty of care as Paula's primary care physician, by failing to monitor Paula's lithium blood levels to ensure those levels remained in the safe and therapeutic range. Dr. Houde also breached her duty to Paula by failing to order a check of Paula's blood lithium levels when Paula's clinical condition changed, i.e., when Paula reported memory loss or exhibited significant weight change.

**C. The Acute Lithium Toxicity Paula Experiences on March 16, 2019 Precipitated A Downward Spiral in Her Health That Ultimately Lead to Her Death On June 15, 2019.**

32. On March 16, 2019, just three weeks after her final appointment with Dr. Houde, Thomas found Paula at their home in a slumped condition, unconscious, with brown saliva coming out of her mouth. Thomas called 911 and Paula was rushed to Heywood Hospital ("Heywood") in Gardner, Massachusetts. Paula never again returned home.

33. Heywood physicians diagnosed Paula with lithium toxicity. Blood tests taken at Heywood found that Paula's lithium level on admission was 1.8 mEq/L, well above the upper limit of normal (1.2 mEq/L). Additionally, Paula exhibited obvious signs of an altered mental state, another recognized symptom of lithium toxicity.

34. Emergency dialysis was necessary to bring down Paula's lithium blood levels. Heywood had no such facilities, and Paula was transferred, on an emergency basis to Bay State Medical Center ("Bay State") in Springfield, MA. The Bay State medical records report that Paula was "intubated for airway protection due to mental status" and that medics had "concern for aspiration." Prior to her episode of lithium toxicity, Paula had never had difficulties with aspiration notwithstanding the swallowing impairment she exhibited after surgery to treat neck cancer.

35. Although Paula was conscious, she still exhibited an altered and agitated mental state. The Bay State records report Paula was "intermittently thrashing around," and not responding to commands. Even after dialysis brought down her lithium levels, she was combative, disorientated, and confused. For example, she kept pulling on her IV lines. Workers had to fit wrist, ankle and vest restraints on her to prevent Paula from injuring herself.

36. Paula's problems with aspiration, however, continued and grew worse. She could not manage to swallow food or water. After multiple failures to swallow, Paula was placed on a feeding tube. Since recovery from her cancer operation more than a decade earlier, Paula had never experienced these types of swallowing and aspiration problems.

37. By March 27, 2019, Paula's mental state had improved. She was able to answer simple questions. But she was continuously having aspiration issues when she

attempted to eat. These issues extended her initial hospital stay and repeatedly required her to be re-hospitalized shortly after being released to rehabilitation facilities.

38. For example, on April 24, 2019, after being hospitalized for more than five weeks, Paula was discharged from Bay State to the Fitchburg Gardens Rehabilitation Center in Fitchburg, MA. But she had to be readmitted to a different hospital, University of Massachusetts-Memorial Hospital ("UMass-Memorial"), that very same day due to shortness of breath and hypoxia (low oxygen blood levels). During this admission, a CT scan of her lungs evidenced findings consistent with aspiration pneumonitis. The notes from that admission acknowledge that Paula had recently "experienced lithium toxicity" and that the effects from that exposure could last "over many weeks following the event particularly if the high lithium levels had been severe and long lasting."

39. Indeed, Paula's respiratory condition continued to deteriorate. As one of the medical records noted that she was "clearly having significant chronic problems with recent aspiration pneumonia after recent lithium toxicity, with hospitalization from another rehab facility." Paula had recurring bouts of aspiration pneumonia, continually sapping her strength and her will to go on.

40. Further, even though lithium levels were reduced, she continued to show signs of agitation, including trying to walk out of her hospital room while attached to her oxygen tube. At one facility it was noted that Paula continued to be agitated and restless, frequently attempting to get out of bed and abscond.

41. Between March 16, 2019 and her death on June 15, 2019, Paula was almost continuously hospitalized, only being released to rehab centers or nursing homes for three

brief periods. On two other occasions, she was released from a hospital only to have to be readmitted the same day. Paula never returned to her home.

42. During much of this period Paula experienced constant thirst and a desire to eat normal foods, but she remained NPO (nothing by mouth) and was fed through a feeding tube. Yet, even though she was no longer eating, she still suffered from aspiration pneumonia. On May 26, 2019, she was admitted to the Heywood ICU, where she was intubated for a second time, and placed on a ventilator.

43. While intubated, Paula communicated to her family and her treatment team that regardless of her condition, she no longer wished to be intubated. She was given DNR/DNI (Do Not Resuscitate/Do Not Intubate) status and extubated on June 2, 2019.

44. During this period her husband, Thomas, visited her on a daily basis. Thomas and Paula had been married for 41 years, and he was 12 years older. Since he had retired, they spent almost all of their time together. They were an extremely close couple who relied on each other. Paula's son, Kenneth, did visit, but he lived out of state and could not visit frequently. Aside from Paula, Thomas had no other close friends or confidants, and Paula's hospitalization and deterioration was extremely difficult for him.

45. Paula was once again re-hospitalized at UMass-Memorial on June 8, 2011. At a June 11, 2019, Goals of Care discussion at the hospital attended by Thomas, Kenneth and other family members Paula confirmed her DNR/DNI, and DNH (Do Not Hospitalize) instructions.

46. Paula was transported back to a nursing home on June 12, 2019, but became hypoxic, and had to be readmitted to hospice care at UMass-Memorial on the same day.

Paula was placed on morphine. Paula died from acute respiratory failure on June 15, 2019.

### D. Dr. Houde's Failure To Monitor Paula's Blood Lithium Levels Was A But-For Cause Of Paula Developing Lithium Toxicity And Its Aftereffects Including Death

47. As the prescriber of lithium carbonate, Dr. Houde should have been monitoring Paula's lithium blood levels at least every six months. Dr. Houde failed to order any testing after 2016. By February 27, 2019, Paula's lithium blood level was almost certainly elevated above a safe and therapeutic level. Due to Paula's significant weight loss, the amount of lithium she had previously been prescribed was almost certainly too high for her current condition. Moreover, she had reported memory loss to Dr. Houde on three occasions, a neurological impairment that could have been related to excess levels of lithium.

48. For any (and all) of the reasons set forth in the preceding paragraph, Dr. Houde should have had ordered a lithium blood level test as part of her February 27, 2019 examination of Paula. Had such testing been ordered for Paula, unsafe levels of lithium would have almost certainly have been detected. Had this testing been done, a competent primary care physician would have reduced or discontinued Paula's lithium usage, or referred Paula to a specialist who would have taken such action. Such actions would have promptly lowered Paula's lithium blood levels back into the safe and therapeutic range, and Paula would have never suffered the acute lithium toxicity symptoms that occurred on March 16, 2019 and which required her to be hospitalized.

49. Paula's acute lithium toxicity symptoms on March 16, 2019, including her altered mental state, led to intubation, to kidney damage, to swallowing problems that

Paula could no longer independently manage, to use of a feeding tube, and to bouts of aspiration pneumonitis and pneumonia as a consequence of repeated aspiration. These conditions resulted in Paula's death.

50. But for Dr. Houde's negligent failure to monitor Paula's lithium levels, Paula would not have exhibited acute lithium toxicity on March 16, 2019; would not have been hospitalized (or even needed to be treated) for the acute consequences of lithium toxicity including altered mental state; would not have required intubation or a feeding tube; and would not have suffered kidney damage, unmanageable swallowing problems, bouts of aspiration pneumonitis and pneumonia or her June 15, 2019 death. Dr. Houde's negligent actions were the direct and proximate causes of these harms to Paula and her family's loss of her society and companionship.

## COUNT ONE

## WRONGFUL DEATH

51. As described in the preceding paragraphs, Dr. Houde's breach of the standard of care for a reasonable primary care physician resulted in Paula's wrongful death as well as substantial pain and suffering on Paula's behalf between March 16, 2019 and her death on June 15, 2019.

52. Pursuant to M.G.L. c. 229, § 2, Kenneth, as the Personal Representative of the Estate of Paula brings this count to recover damages caused by Dr. Houde's negligence which has resulted in Paula's death, including, but not limited to, compensation for the services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent to her husband, Thomas, and her only son, Kenneth.

53. Pursuant to M.G.L c. 229, § 6, Kenneth, as the Personal Representative of the Estate of Paula also brings this count to recover conscious pain and suffering Paula suffered prior to her death as a result of Dr. Houde's negligence, including the pain and suffering Paula suffered on or after March 16, 2019 as a result of the symptoms of lithium toxicity she exhibited and all medical consequences caused by the episode of lithium toxicity.

54. Due to Dr. Houde's status as an employee of an FQHC, the United States is liable for all monetary damages caused by Dr. Houde's negligence in the same manner and to the same extent as Dr. Houde would be (but for interest prior to judgment and punitive damages).

## COUNT TWO

### LOSS OF CONSORTIUM BY THOMAS BETWEEN MARCH 16, 2019 AND JUNE 15, 2019

55. As described in the preceding paragraphs, Thomas was Paula's lawful spouse between March 16, 2019 and June 15, 2019.  Prior to March 16, 2019, Thomas resided with Paula at their home in Gardner, MA.

56. As a result of Dr. Houde's negligence, Thomas lost the care, assistance, companionship, comfort, guidance, advice, and services of Paula from March 16, 2019, when Paula was admitted to hospital, until her death on June 15, 2019.  But for her status as an employee of Government for the purposes of the FTCA, Dr. Houde would ordinarily be liable for Thomas' loss of consortium for this period.

57. Due to Dr. Houde's status as an employee of an FQHC, the United States is liable for the monetary damages caused by Dr. Houde's negligence, including the loss of

consortium Thomas suffered while Paula was still alive, in the same manner and to the same extent as Dr. Houde would be (but for interest prior to judgment and punitive damages).

## CONCLUSION

WHEREFORE, Plaintiffs Kenneth Meador, as Personal Representative of the Estate of Paula Meador, and Thomas Meador, the bereaved husband of Paula Meador, pray for judgment against the United States of America in an amount of just compensation for the damages caused by Dr. Houde's negligence, together with interest, costs and attorney's fees, as provided by law.

Respectfully submitted,

KENNETH MEADOR
(as the Personal Representative of the
ESTATE of PAULA MEADOR)
and THOMAS MEADOR

Dated: March 15, 2022

By their attorneys,

**GREENE LLP**

/s/ Thomas M. Greene
Thomas M. Greene, Esq.  BBO # 210020
tgreene@greenellp.com
Michael Tabb, Esq.  BBO # 491310
matabb@greenellp.com
Eugenie S. Reich, Esq. BBO # 703853
ereich@greenellp.com
One Liberty Square, 12th Floor
Boston, MA 02109
(617) 261-0040